**UNITED STATES of America**

v.

**Roger Bernard SMITH, John Phillip Hansen, Carmen Delynn Green.**

**Crim. No. 4–88–104–E.**

United States District Court,
N.D. Texas,
Fort Worth Division.

May 26, 1989.

Randell P. Means, Asst. U.S. Atty., for U.S.

R.H. Wallace, Fort Worth, Tex., for Carmen Delynn Green.

Marshall J. Day, Fort Worth, Tex., for John Phillip Hansen.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

This case involves the importation of controlled substances into the United States from Panama. On June 21, 1988, Defendants Carmen Delynn Green and John Phillip Hansen were arrested at the Dallas–Fort Worth International Airport ("DFW") for conspiracy to possess with intent to distribute cocaine and for aiding and abetting interstate travel in commission of a felony. Both of the Defendants seek to suppress the evidence obtained following their allegedly illegal arrests. After an evidentiary hearing, the Court makes the following determination.

## FACTUAL BACKGROUND

The events which led to the arrests begin on June 20, 1988, the day before the Defendants were arrested, at the Miami International Airport. On June 20, 1988, a third Defendant, Roger Bernard Smith, was apprehended by U.S. Customs officials at the Miami International Airport. Smith had arrived at the Miami airport from a flight which had originated in Panama where it is believed Smith was stationed in the United States Army. When Smith attempted to pass through Customs after departing from the flight from Panama, officials of the U.S. Customs Service detected a package taped around his waist. This package contained a white, powdery substance later identified as 433.5 grams of cocaine. Thereafter, the Customs officials took Smith into custody and called the Drug Enforcement Agency ("DEA") to the scene. Matthew Addington, a special agent with the DEA, testified that he responded to a call from Customs and arrived at the scene where other DEA agents had already arrested Smith and seized the cocaine. After questioning by DEA agents, Smith revealed that he had intended to deliver the cocaine to another individual in Dallas, Texas and that such individual was to give him further instructions with regard to the cocaine. Officer Addington testified that the name "Green" was the name used by Smith as the person he was to meet in Dallas. The DEA agents then began to make arrangements for a "controlled delivery" of the cocaine to the unknown individual in Dallas. In a "controlled delivery," the DEA stages a delivery as originally planned. Then, when the unknown individuals emerge for the delivery, the DEA agents are able to ascertain the identities of the co-conspirators and make the arrests.

The agents allowed Smith to make three telephone calls—which were recorded—to attempt to contact the unknown individual in Dallas. The first phone call was allegedly to a Marvin Stansfield, whose name, according to agent Addington, "kept coming up" in Miami. Upon dialing the number given to the agents by Smith, a recording came over the line stating that the number had been disconnected and was no longer in service. The second telephone call was to a man named "Carmen," allegedly a friend of Marvin Stansfield, and

later identified as the Defendant, Carmen Green. Smith asked for "Carmen" and the voice on the other end replied "Yea." The two then made arrangements for Green to meet Smith when he arrived in Texas. In a third telephone call, Smith again contacted Green and made arrangements with Green to pick him up at the DFW airport the following evening and told him that he would be arriving on Delta flight No. 574. Smith further told Green, "If you can get a hold of Marvin, bring him along with you if you can," to which Green—as though he was having difficulty in hearing—responded, "Who's that?" Smith then repeated, "If you get a hold of Marvin, tell him to come along," to which Green replied, "Okay."

Smith arrived with the DEA agents at DFW on an earlier flight than the one disclosed to Green. After a briefing with Dallas DEA agents, Smith's arrival was staged from Delta flight No. 574—the flight disclosed to Green—which arrived at 11:08 p.m. on July 21, 1988. Upon deboarding the plane, Smith was followed by two DEA agents who walked approximately fifteen feet behind him and kept constant surveillance of him. Other DEA agents were likewise scattered about the airport to observe the anticipated delivery. The DEA agents testified that they saw Smith make eye contact with either Hansen or Green while Smith was deboarding.[1] Officer Addington was following Smith. Addington testified that he saw Green make eye contact with Smith and say to Hansen, "That's him." The agents then kept surveillance of Smith, Green, and Hansen for an hour to an hour and a half, during which time the three would walk around, sit down periodically, and so forth. The time was between 11:00 p.m. and 12:30 a.m. and the airport traffic was relatively sparse.[2] While the men were being watched inside the airport, other DEA agents ran a registration check on Green's car, which the agents observed Green and Hansen arrive in together. As a result, the agents discovered that the car was registered to Barbara Green and Carmen Green from Bryan, Texas.

By this time the agents had given up on the prospect of a delivery. Three DEA agents approached Green, identified themselves as DEA agents, disclosed their badges, and asked if they could speak with him. Green consented. The agents asked for proof of his identification and Green produced his driver's license. Upon reading that his name was Carmen Green, and comparing the picture on the license with Green, the agents placed him under arrest without a warrant. The agents then searched Green and seized a piece of paper found in his back pocket with the flight information and several numerical calculations written on it.

Meanwhile, Defendant Hansen had been observed driving Green's car around to and fro in the airport parking lot. Officer Cloud, a Fort Worth police officer who had been assigned to the drug task force at DFW for three years, testified that, while sitting on a curb bench by the passenger unloading area earlier that evening, he had observed Green and Hansen when they originally arrived at the airport.[3] He later remembered Hansen because he was wearing a brightly colored shirt. While Green was being arrested inside, the agents who had been observing Hansen arrested him outside of the airport. Hansen was arrested inside Green's car, placed under arrest, removed from the vehicle, and read his *Miranda*[4] warnings.

Upon arresting Hansen, the agents made a cursory search of the car for weapons. The car was then seized and taken to the

---

1. One officer testified that Green made eye contact with Smith while another officer included in her report that Hansen was the one who made eye contact with Smith. Still another officer testified that *both* Hansen and Green made eye contact with Smith.

2. As Agent Addington described the scene at the airport: at one point it was just Smith, the two men, and numerous DEA agents.

3. Cloud testified that even though it was late at night when the Defendants arrived, he could see them through the car window as they drove by and could remember them later, "because it's my job."

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

task force office where the DEA agents again made a search of the car, this time for valuables and contraband. It was during this search that a small amount of marijuana was found in a plastic bag in a compartment in the back seat of the car. The compartment was described as a pouch attached to the back of the front seat. Officer Couch testified that he did not recall anyone making an inventory list of the search and does not know if anything else was seized by the several other agents who also searched the car. Couch said that an inventory list was not required because no valuables were found in the car.

The Defendants were transported to the task force office where Officer Addington testified that he read Defendant Hansen his *Miranda* warnings twice. After Hansen agreed to waive his rights, Addington began questioning him. Agent Addington testified that the agents told Hansen if he was truthful and cooperative, the agents would go before the judge on his behalf and tell the judge that he had cooperated. "If you lie," Addington told him, "it's going to hurt you. It's going to be tough on you if you lie to us." Addington also testified that he heard other agents tell Hansen that if he did not cooperate, that things would, in essence, go a lot tougher on him due to his prior criminal record.[5] Hansen gave a written statement of the events leading up to his arrest. His original statement was handwritten and was later typewritten by the DEA. The typewritten statement was then signed by Hansen.

Hansen also signed a written consent to search the hotel room at the Red Roof Inn in Irving, Texas, where Hansen and Green had stayed the preceding night. Hansen told the agents he stayed in the room, and he had the key in his possession at the time of the arrest. Upon searching the hotel room, the DEA agents found and seized a scale and a plastic bag of marijuana.

## DISCUSSION

### A. *Legality of Green's Arrest*

■ Green seeks to exclude from evidence the papers found in his pocket at the time of his warrantless arrest. He contends that his arrest was illegal, that the search incident to that arrest was tainted by the illegal arrest, and therefore the papers should be excluded from evidence as the "fruit" of an illegal arrest.[6] Alternatively, Green argues that because papers are not weapons, the search exceeded the scope of a search incident to a lawful arrest.

In resolving Defendant's first contention that the arrest was illegal, the Court must determine the point of arrest and whether probable cause existed at that point.[7] The Court finds that Green was not arrested until the point when he was physically placed under arrest by the DEA agents. Before Green was placed under formal custody, there was no arrest and there was no seizure which may have implicated the fourth amendment.[8] Until the actual arrest, Green's encounter with the agents was merely "communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment."[9]

Having concluded that Green was under arrest at the point he was taken into for-

---

5. The agents apparently came across Hansen's parole card during the search of his person, but there was no evidence that the card was used to coerce Hansen's statement.

6. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

7. *See, United States v. Martinez,* 808 F.2d 1050, 1055 (5th Cir.) *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987).

8. The Court notes that Green does not contend the initial stop constituted a "seizure."

9. *United States v. Berry,* 670 F.2d 583, 591 (5th Cir.1982) (en banc). In *Berry,* the Fifth Circuit carved out three tiers of police-citizen encounters within the context of the fourth amendment:

> (1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief "seizures" that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause.

*Id.* at 591.

mal custody, the Court must now determine whether the arrest was supported by probable cause. Probable cause exists "when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed."[10] Probable cause requires more evidence than would constitute a reasonable suspicion, but less than would be required for a conviction of guilt.[11] When the Court determines whether probable cause existed, it must look to the "totality of the circumstance."[12]

The facts in this case indicate that the agents had probable cause to arrest Defendant Green. The Dallas agents were briefed extensively by the agents from Miami who traveled to Dallas to participate in the controlled delivery. When Smith was arrested in Miami, he had nearly one pound of cocaine tied around his waist. Smith had planned to make a delivery of the cocaine to an individual in Dallas. Smith gave a statement wherein he identified Green as an intended recipient of the cocaine and a participant in the transaction. The agents monitored two telephone calls from Smith to Green. During those calls, Green identified himself as the person on the other end of the line and arranged to meet Smith at DFW airport at a particular time and at a particular place where a specified flight would arrive. Green was, in fact, at the airport at the particular time and at the particular place to meet the flight specified by Smith. Green acknowledged to Hansen, "That's him," referring to Smith as he deboarded the flight. The agents also knew, from running a check on the license plate on the vehicle which they observed the Defendants arrive in together, that the vehicle was registered to a

Carmen Green. When the agents realized that a delivery would not be made, they approached Green, identified themselves, and asked to talk with him. Green agreed to speak with the agents and provided identification when asked to do so by the agents. At that point, the agents were assured that the man they had been observing was the one Smith had informed them about. From the totality of the facts and circumstances known to the agents at the time of the arrest, the Court determines that there was probable cause for the arrest of Carmen Delynn Green. A search of Green was then made incident to the lawful arrest. "It is the fact of the lawful arrest which establishes the authority to search...."[13] The arrest being lawful, the search incident to the arrest requires no additional justification.

■ Having found that Green's arrest was supported by probable cause, the Court turns to Green's argument that the search exceeded the scope of a search incident to a lawful arrest. Green argues that because the items seized were papers, the agents could not have reasonably suspected that Green was carrying weapons. By seizing the papers, Green argues, the agents exceeded the scope of a search incident to a lawful arrest.

The seminal Supreme Court case defining the scope of a search incident to a lawful arrest is *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In *Chimel*, the Court stated:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arres-

**10.** *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *see also, Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir.1988).

**11.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**12.** *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see also, United States v.*

*Antone*, 753 F.2d 1301, 1304 (5th Cir.), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *United States v. Garcia*, 732 F.2d 1221, 1223 (5th Cir.1984).

**13.** *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973).

tee's person in order to prevent its concealment or destruction.

*Id.* at 762–763, 89 S.Ct. at 2040.

Defendant Green argues that because papers are not weapons, the search was excessive in scope. This is simply not the case. At the time the agents arrested Green, they had the authority to search for not only weapons, but for evidence which could be concealed or destroyed by the Defendant. The search and seizure of the papers were within the scope of the agents' authority.[14]

Accordingly, Defendant Green's motion to suppress evidence based on unlawful arrest and unlawful search incident to an arrest are denied.

## B. *Inventory Search*

Green also seeks to exclude the marijuana found in his car on the basis that the warrantless search was not an inventory search, and it was therefore beyond the scope of the exception to the warrant requirement. Green bases his argument on the fact that the testifying agent couldn't remember who searched the car or if an inventory was made of the search.

██ Although Officer Cloud was not in charge of taking a physical inventory, he testified that he believed that someone did take one. Nevertheless, lack of a written inventory list does not vitiate an otherwise valid inventory search, and does not enter into the Court's analysis of whether the search was reasonable.[15]

██ Inventory searches are an exception to the warrant requirement and are not dependent on probable cause.[16] The Supreme Court has formulated this exception after balancing the individual's expectation of privacy against the government's interests of protecting the owner's property while in police custody, to protect the police against claims or disputes over lost or stolen property, and to protect the police from potential danger.[17] An inventory search is reasonable if conducted according to standardized procedures, for it is the absence of police discretion which forms the rationale for allowing the inventory exception to the warrant requirement of the fourth amendment.[18] An inventory search cannot be used as a general investigation for evidence of a crime.

██ Officer Cloud testified that he was looking for "any contraband or valuable property that we were responsible for." He also testified that under the circumstances of an arrest, conducting an inventory search was a standard police procedure which the DEA also follows. The Court finds that the inventory search was valid, according to standardized procedure, and that the lack of a written inventory list does not vitiate the otherwise valid inventory search. Defendant's motion is denied.

## C. *Legality of Hansen's Arrest*

Defendant Hansen requests the suppression of his statements and the items found in the hotel room on the ground that his initial arrest was illegal as not supported by probable cause and that any consent to search and any statement given in connection with his arrest were therefore tainted by the illegal arrest. Alternatively, Han-

---

**14.** *See, Sibron v. New York,* 392 U.S. 40, 67, 88 S.Ct. 1889, 1905, 20 L.Ed.2d 917 (1968); *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964), *compare Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (where police officer believes his safety or the safety of others is in danger, he may make a reasonable search for weapons of the person believed by him to be armed and dangerous, regardless of whether he has probable cause to arrest. Such a search is not justified by any need to prevent the disappearance or destruction of evidence of crime.).

**15.** *See, United States v. Trullo,* 790 F.2d 205, 206 (1st Cir.1986); *United States v. O'Bryant,* 775 F.2d 1528, 1534 (11th Cir.1985); *see also, United States v. Cataldo,* 832 F.2d 869 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988).

**16.** *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed. 2d 65 (1983).

**17.** *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

**18.** *See, Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

sen argues that his consent to search and his statement were given as a result of involuntary coercive tactics used by the DEA agents.

### 1. Probable Cause

■ The Court will first consider whether the warrantless arrest of Hansen was supported by probable cause. In making this determination, the Court will employ the same probable cause standard as stated previously in this opinion, considering the facts and circumstances under the totality of the circumstances. Probable cause requires more evidence than would constitute a reasonable suspicion, but less than would be required for a conviction of guilt.

After considering the totality of the circumstances surrounding the arrest, the Court finds that the facts and circumstances are insufficient to occasion a person of reasonable prudence to believe an offense was being committed by Defendant John Phillip Hansen.

At the time the agents arrested Hansen, they knew that he had arrived with Green; that Green had acknowledged to Hansen "That's him" in reference to Smith; and that Hansen had been driving Green's car around the parking lot during the surveillance, "acting nervous." Smith never gave the agents a description of Green or of Hansen. In fact, Hansen's name was never even mentioned in the course of the entire episode. The agents did not believe that Hansen may have been the unknown Marvin Stansfield.[19]

None of these facts, singularly or collectively, are sufficient to occasion a person of reasonable prudence to believe an offense had been committed by Hansen. Each of these facts merely associates Hansen with the Defendant Carmen Green. In *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Supreme Court held that "a person's mere propinquity to others independently suspected of criminal activi-

ty does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Id.* at 91, 100 S.Ct. at 342 (citations omitted); *see, Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902–03, 20 L.Ed.2d 917 (1968).

### 2. Consent to Search

Hansen gave a written statement and gave consent to search the hotel room where he and Green had stayed the previous night. However, in order to purge the taint of the illegal arrest, the government must prove that the statement was given voluntarily and that the consent was both voluntary for purposes of the fifth amendment and that it was not the product of the illegality for purposes of the fourth amendment. The Court determines that Hansen gave his statement and consent voluntarily for purposes of the fifth amendment.

### 3. Fruit of the Poisonous Tree

Because the Court finds that the arrest of Defendant John Phillip Hansen was not supported by probable cause, the evidence obtained as a result of the arrest must be suppressed unless the government can show that the taint of the illegal arrest was attenuated by intervening circumstances. The exclusionary rule "extends as well to the indirect as the direct products" of unconstitutional conduct.[20] The evidence obtained as a result of the illegal arrest includes the items seized from Hansen during the search incident to the arrest; Hansen's written and oral statements; and the evidence seized during the search of the hotel room pursuant to Hansen's consent.

The factors to be considered in determining whether the intervening circumstances attenuate the taint include the temporal

---

**19.** Smith gave the agents a description of Marvin Stansfield as a Columbian with a large scar on his right cheek. Both Defendants are caucasian and do not have any noticeable scars on their faces.

**20.** *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963)).

proximity of the search or confession and the arrest, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct.[21]

### a. *Search Incident to the Arrest*

■ Clearly, there were no intervening circumstances between the time of the arrest and the immediate search of the Defendant. The evidence obtained from Hansen as a direct result of the arrest must therefore be suppressed as the "fruit" of the illegality.

### b. *Statement and Consent to Search Hotel Room*

■ Immediately after the arrest, Hansen was transported to the DEA office at DFW where he was again read his *Miranda* warnings twice and where he gave an oral statement which was reduced to writing and signed a written consent to search the hotel room at the Red Roof Inn, both dated June 21, 1988 and both obtained at the behest of the DEA agents. In evaluating the effect of the illegality, the analysis is as the Supreme Court stated in *Wong Sun*, 371 U.S. 471, 83 S.Ct. at 407:

> [W]e need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by the exploitation of that illegality, or instead by means sufficiently distinguishable to be purged of the primary taint." (citations omitted.)

*Id.* at 487–488, 83 S.Ct. at 417.

The government has the burden to prove by a preponderance of the evidence that the challenged evidence is no longer tainted. In the present case, the illegality—the illegal arrest—was exploited to obtain both the consent and the statements of Hansen at the DEA office. Hansen was interrogated late at night immediately after the arrest of the Defendant in the DEA office, and the government has failed to show any intervening circumstances which might remove the taint of the illegal arrest. Although Hansen was warned of his rights under *Miranda v. Arizona*, the warnings, described as a prophylactic rule to protect fifth amendment rights, "have not been regarded as a means either of remedying or deterring violations of Fourth Amendment rights."[22] Hansen's statements and consent have not been purged of the primary taint and should therefore be suppressed in order to effectuate the guarantees of the fourth amendment.

### D. *Green's Motion to Suppress Evidence Obtained From Hansen*

Defendant Green has requested the Court to suppress the evidence obtained as a result of the illegal arrest of Hansen at Green's trial. In determining whether to invoke the exclusionary rule, the Court must determine whose fourth amendment rights have been violated, for the fourth amendment confers personal rights—rights that may not be vicariously asserted.[23] Green has the burden of establishing that his own fourth amendment rights were violated by the challenged search,[24] and not just that he will be aggrieved solely by the introduction of damaging evidence.

### 1. Search of Hansen and Statements

To assert the exclusionary rule, one must have had his personal rights affected by the illegal conduct of the police. The Court

**21.** *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (citing *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)); *see United States v. Wilson*, 569 F.2d 392 (5th Cir.1978) (applying the *Brown* factors where the evidence has been obtained by means of a consent to search rather than a confession).

**22.** *Brown v. Illinois*, 422 U.S. 590, 601, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416 (1975).

**23.** *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

**24.** *See Simmons v. United States*, 390 U.S. 377, 389–90, 88 S.Ct. 967, 973–74, 19 L.Ed.2d 1247 (1968).

determines that Green has not demonstrated a personal fourth amendment interest to assert the protections of the exclusionary rule in his effort to exclude the evidence obtained incident to the unlawful arrest of Hansen or to exclude the statements made by Hansen.

■ Green's fourth amendment rights were not violated by the illegal arrest of Hansen. Although the illegality tainted this evidence and must be suppressed from admission at trial against Hansen, it does not follow that they must be suppressed from use against Green. The purpose of the exclusionary rule is to effectuate the guarantees of the fourth amendment through prevention. Application of the rule deters illegal conduct of law enforcement officers and insures judicial integrity by excluding unconstitutionally obtained evidence. Exclusion of evidence based on the violation of another's constitutional rights would not further this objective. Green's motion to suppress the evidence obtained incident to Hansen's arrest and the use of Hansen's statement are hereby DENIED, as Green's personal rights were not violated.[25]

### 2. Hotel Search

The evidence obtained from the search of the hotel room requires a somewhat different analysis. The fourth amendment does not protect places or property.[26] Rather, it protects individuals from the unlawful intrusion in areas where persons have legitimate privacy interests. The question therefore becomes first, whether Green had a reasonable expectation of privacy protected by the fourth amendment, and secondly, whether the search violated that interest.

■ The Court finds that Green had a legitimate expectation of privacy in the hotel room where he had spent the night and left his clothing and personal effects.[27] Because Green has asserted a privacy interest in the hotel room, which is entitled to fourth amendment protection, the Court must now determine whether the evidence was obtained in violation of that constitutional interest.

As previously noted, the officers did not obtain a search warrant to search the hotel room, and Green did not give his consent to search the hotel room. A search without a warrant is *per se* unreasonable,[28] subject only to a few specifically established and well-delineated exceptions.[29] However, the officers rely on Hansen's consent to justify the warrantless search. Consent is a well-recognized, valid exception to the warrant requirement if the government proves that the consent was given voluntarily—not as the result of duress or coercion, express or implied—and that it was provided by one with authority to give consent.[30]

■ The first step the government must hurdle is whether Hansen had the authority to consent to the search of the hotel room which was registered in Green's name. In *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242

**25.** *See United States v. Tolliver,* 780 F.2d 1177 (5th Cir.1986), *reversed on other grounds,* 479 U.S. 1074, 107 S.Ct. 1267, 94 L.Ed.2d 128 (1987) (defendant lacked standing to challenge the evidence seized as the result of a codefendant's illegal arrest).

**26.** *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967).

**27.** *See Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (Court found a fourth amendment privacy interest in friend's apartment where defendant had slept and in which he kept his clothing); *see also United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951) (co-occupant of hotel room had standing to suppress evidence illegally obtained from premises).

**28.** *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

**29.** Generally, a warrant supported by probable cause must issue in order to validate a search. Exceptions to the warrant requirement include: (1) searches incident to a lawful arrest; (2) searches supported by probable cause, coupled with exigent circumstances; (3) searches in plain view; (4) inventory searches; and (5) searches pursuant to valid consent. In this case the government relies only on the consent of Hansen. Clearly, the facts would not support a finding within any of the other exceptions.

**30.** *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

(1974), the Supreme Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.* at 170, 94 S.Ct. at 993. This concept of "third party consent" is based on the premise that the joint possessor has assumed the risk that the other may allow an outside party to search the premises. The evidence shows that Hansen and Green both stayed in the room on the preceding night; that Hansen left his personal belongings in the room; and that Hansen was carrying a key to the room on his person at the time of his arrest. The Court determines that the evidence supports the finding that Hansen had the above described third party authority to consent to the search of the hotel room.

The next inquiry is whether the consent constituted a valid, voluntary consent under the Supreme Court's holding in *Busta-monte*, 412 U.S. at 248, 93 S.Ct. at 2058. The Court finds from the totality of the circumstances that Hansen's consent was voluntary, uncoerced by any flagrant official misconduct. Therefore, the search of the hotel room was constitutional, as the officers obtained voluntary consent from one who had authority to grant such consent.[31] Green's motion to suppress the evidence seized during the search of the hotel room is hereby denied.

### ORDER

In · view of the foregoing, Defendant Green's motion to suppress is DENIED. Defendant Green is set for trial on July 24, 1989, with docket call at 9:00 a.m. on that day. Defendant Hansen's motion to suppress the evidence identified in the indictment is GRANTED. Because the Court finds no probable cause to support Hansen's arrest and because the suppressed matters appear to be essential to prosecution, counsel are directed to appear at a status call at 9:00 a.m., July 24, 1989, to discuss any anticipated further proceedings. Defendant Hansen's presence at that status call is waived.

---

31. While the evidence obtained from the search of the hotel room is inadmissible against Hansen, it is inadmissible for the sole reason that the consent was tainted by the illegal arrest of Hansen. The exclusionary rule is invoked in this case to deter the illegal conduct—the arrest of Hansen. The deterrent effect of the rule would not be served by excluding the evidence against Green as well because the illegality relates only to Hansen. To extend the exclusion to Green would be too tenuous an application of the rule—an application which this Court cannot justify.

As the Supreme Court stated in *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969):

The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth.

*Id.* at 174–175, 89 S.Ct. at 967.